# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 15, 2015

## STATE OF TENNESSEE v. MICHAEL DEAN HODGES

**Appeal from the Criminal Court for Davidson County**
**No. 2012-C-2511      Cheryl Blackburn, Judge**

---

**No. M2014-01544-CCA-R3-CD – Filed April 19, 2017**

---

The Davidson County Grand Jury indicted the Appellant, Michael Dean Hodges, of aggravated child abuse in counts one through three and aggravated child neglect in count four. After a jury trial, the Appellant was acquitted in count one but convicted as charged in counts two and three and convicted of knowing aggravated assault as a lesser-included offense of aggravated child neglect in count four. The trial court merged the aggravated assault conviction into the aggravated child abuse convictions and sentenced the Appellant to an effective twenty-five-years in confinement to be served at 100%. On appeal, the Appellant claimed that the trial court erred by failing to sever the charge of aggravated child abuse in count one from the remaining two counts of aggravated child abuse; that the trial court erred by allowing the jury to hear a portion of his statement in which he admitted to prior bad acts; that the trial court erred by giving the jury a supplemental instruction on "knowingly" that failed to include language about non-accidental conduct; and that cumulative error warranted a new trial. This court concluded that the trial court erred by allowing the jury to hear that the Appellant had been "in trouble" previously but that the error was harmless; however, we concluded that the Appellant's conviction of aggravated assault had to be reversed because knowing aggravated assault was not a lesser-included offense of aggravated child neglect. The Tennessee Supreme Court granted the Appellant's application for permission to appeal and remanded the case to this court for reconsideration in light of the court's recent opinion in State v. Howard, 504 S.W.3d 260 (Tenn. 2016), regarding lesser-included offenses. Upon reconsideration, we again conclude that knowing aggravated assault is not a lesser-included offense of aggravated child neglect as charged in this case and modify the conviction to reckless endangerment.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Modified in Part**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Brent Horst, Nashville, Tennessee, for the appellant, Michael Dean Hodges.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

In September 2012, the grand jury indicted the Appellant for aggravated child abuse resulting in serious bodily injury in counts one, two, and three and aggravated child neglect resulting in serious bodily injury in count four.  Victoria Stuart, the Appellant's girlfriend and the victim's mother, was named as a codefendant in count four and was charged with being an accessory after the fact in count five of the indictment.  Stuart filed a motion to sever her case from that of the Appellant, and the trial court granted the motion.

Although the Appellant does not challenge the sufficiency of the evidence, we will summarize the proof presented at trial.  Tina Simmons, a pediatric nurse practitioner at the Hendersonville Children's Clinic, testified that on June 29, 2011, the Appellant and Stuart brought the victim, who was born on November 22, 2010, to the clinic for her six-month "well child visit."  Simmons performed a thorough physical examination, which included checking the victim's ribs and conducting a neurological exam, and did not find any signs of physical abuse.

Summer Green, Stuart's sister and the victim's aunt, testified that on June 30, 2011, she babysat the victim and that the victim "was a little whiny but nothing unusual." On July 3 or 4, 2011, Green learned the victim had been injured and went to Vanderbilt Children's Hospital.  Green asked the Appellant about the victim's injuries, and the Appellant told her that he threw the victim into the air, that he "hesitated," and that the victim fell.  However, the Appellant's story later changed, and he told Green that he dropped the victim because his hands were "slippery" from washing dishes or cooking. When the victim was discharged from the hospital, Green took her home.  The victim had a cast on her right leg for six to eight weeks and a feeding tube for at least six months. She also could not control her eyes and took medication for seizures and pain.  At the time of trial, the victim did not speak well, had to gesture for what she wanted, and did not walk straight.

Dr. Bradley Hoover testified that about 11:25 a.m. on July 3, 2011, the victim's parents brought her to the emergency room at Summit Medical Center. Dr. Hoover examined the victim and noticed a bump on her head. The Appellant and Stuart reported that the victim began having decreased activity and increased sleeping on June 30. However, they did not report a fall or trauma, which was very concerning. A CAT scan showed that the victim had two skull fractures, one along her right parietal area and one in the back of her skull, and a subdural hematoma beneath one of the fractures. Based on the CAT scan results, Dr. Hoover had her transported to Vanderbilt Children's Hospital.

Officer Charles Eaton of the Metropolitan Nashville Police Department (MNPD) testified that on July 3, 2011, he responded to a call from Vanderbilt Children's Hospital and learned that the victim had a skull fracture, three rib fractures, and a femur fracture. He spoke with the victim's parents, and the Appellant stated that he thought the injuries resulted from the victim's falling in her crib sometime between 9:00 p.m. on July 1 and 7:00 a.m. on July 2. The Appellant claimed that when he took the victim out of her crib at 7:00 a.m. on July 2, he noticed that her head was "bouncing up and down" and saw a soft spot on her skull. The Appellant said he and Stuart took the victim to Summit Medical Center that day. However, Officer Eaton later learned that they did not take the victim to Summit until July 3.

Victoria Stuart testified that on July 1, 2011, the victim was "just fine." The Appellant got out of bed during the night to tend to the victim and reported to Stuart that the victim was screaming and would not eat. The next morning, Stuart and the Appellant could not wake the victim. The victim had a fever, her head was "bobbing," and her eyes would not focus. She also vomited. Stuart said that the victim had received immunizations at her six-month check-up on June 29 and that she thought the victim's symptoms were a delayed reaction to the shots. On July 3, the victim's fever had decreased but her other symptoms remained, so Stuart and the Appellant took the victim to the emergency room. The Appellant did not tell Stuart that he had thrown the victim into the air or that she had hit the floor or her crib.

Stuart testified that the victim was transferred to Vanderbilt Children's Hospital, where Stuart learned that the victim had a hairline fracture, a broken femur, and cracked ribs. She said that she did not cause the victim's injuries and that she did not see the Appellant cause the injuries. However, the Appellant would become angry with the victim's crying and was alone with the victim many times. The police interviewed the Appellant twice at Vanderbilt. After the Appellant's first interview, he "wouldn't look [Stuart] in the face" and was "very dodgy." After his second interview, he told Stuart that he had dropped the victim on Friday, July 1. The Appellant said that he threw the victim into the air, that he did not catch her, that she hit her head on an exercise machine,

and that he grabbed her leg. The Appellant also told Stuart that "there was an instance before that where his hands were wet, and he dropped [the victim] on the bars of her crib." On July 7, Detective Kenneth Stephens interviewed the Appellant at the police department. After the interview, the Appellant told Stuart that he had been coerced into saying that he intentionally harmed the victim. The Appellant maintained that he accidentally hurt the victim. However, Stuart "kept getting different stories" from him. She said the State had not promised her anything in exchange for her testimony.

On cross-examination, Stuart testified that on July 2, the Appellant suggested several times that they take the victim to the hospital, but Stuart declined because she thought the victim was reacting to the immunizations. Stuart and the Appellant had other children, and Stuart never saw the Appellant act violently or excessively rough toward them. She said that the Appellant would "[hand] the kids off" when he got frustrated, that he helped her with parenting, and that she had no reason to think he intentionally hurt the victim.

Kenneth Stephens testified that in July 2011, he was a detective with the MNPD. On July 3, Stephens responded to a call about a child with injuries at Vanderbilt Children's Hospital. He learned that the victim's rib fractures were healing and, therefore, had been received at an earlier date but that the victim's skull and femur fractures were recent. Stephens interviewed the Appellant for more than two hours in the hospital waiting room. The Appellant claimed that about 11:30 p.m. on Friday, July 1, the victim woke up screaming. The Appellant tried to feed her, but she would not eat and went back to sleep. About 3:00 a.m., the victim again woke up screaming, the Appellant tried to feed her, and she would not eat. The Appellant noticed that the victim had vomited. About 8:00 a.m., the victim felt warm, and the Appellant could not wake her. She drank from a baby bottle but vomited. Later that day, the victim was "awake and whiny," but her head would "bounce" and her eyes were "twitching." About 10:00 p.m., the Appellant found a soft spot on the right side of the victim's head. The Appellant claimed that he and Stuart took the victim to the hospital about 9:30 on Sunday morning. However, Stephens later learned that they had not arrived until 11:30 a.m., despite living a short distance away. The Appellant did not offer any explanation for the victim's injuries and "was sure that [Stuart] would not have done anything to cause injury to the baby." Stephens said that after he spoke with the Appellant, he spoke with Stuart. Stuart was not truthful or "forthcoming" in parts of her interview.

Stephens testified that he then interviewed the Appellant for a second time at the hospital. Stephens said that he had been "gentle" with the Appellant during the first interview but that he was "a little bit more forward" with the Appellant during the second interview. During the second interview, which was audio-recorded and played for the jury, the Appellant eventually admitted that he dropped the victim. He said that she hit

her head "smack dab" on the edge of a dresser and that she hit her leg "by the crib." The Appellant said that the victim's rib injuries may have occurred a couple of months earlier. He explained that he had been cooking, that his hands were greasy, and that the victim slipped out of them. The victim's chest hit the rail of her crib, and she fell onto the carpet.

Stephens testified that on July 7, 2011, he interviewed the Appellant for a third time. The interview occurred at the police department and was video-recorded. During the interview, which the State played for the jury, Stephens accused the Appellant of lying. However, the Appellant maintained that he accidentally dropped the victim. Stephens continued to confront the Appellant about how he broke the victim's femur, and the Appellant stated that he threw the victim into the air, failed to catch her, and "pulled" her leg. The Appellant said that he had been frustrated with the victim due to her crying but that he did not intentionally hurt her.

Deborah Lowen, a pediatrician at Vanderbilt Children's Hospital and the director of the "child abuse team," testified that she evaluated the victim and spoke with the victim's parents on July 3, 2011. The victim's skull fractures crossed across a suture line, indicating that "a higher degree of force" caused the fractures. Dr. Lowen said the skull fractures and resulting hematoma were inconsistent with a simple fall or the Appellant's claim that he dropped the victim. The victim's femur had sustained a "buckle" fracture near the right thighbone. Dr. Lowen explained that the fracture was an "impaction injury from the bone being kind of pushed from the end" and that the injury could have occurred if the victim had been dropped and landed on her knee. Dr. Lowen doubted that the injury could have been caused by grabbing or pulling the victim's leg and did not think "the exact same mechanism" could have caused the victim's femur and skull fractures. She stated that three of the victim's right ribs were broken "in about a straight line" and that such an injury usually occurred "[w]hen the chest [was] squeezed" by an adult's hands around a baby's chest. She said that she did not know the amount of force needed to break a baby's ribs in that manner but that the force "would have been outside of normal care giving in a healthy baby" and was not the result of an accident. Dr. Lowen said that a baby's ribs healed very quickly. She estimated that the victim's rib fractures occurred one month to six weeks prior to the skull and femur fractures and stated that the victim would have been fussy due to pain for three or four days after sustaining the fractures.

Dr. Lowen testified that in addition to the victim's various fractures, she "remained with an altered level of consciousness and with altered neurologic status for many, many days, for most of the course of the hospitalization and only very gradually improved." The victim was irritable, difficult to console, and had a high-pitched cry. Dr. Lowen opined that the victim's injuries were the result of non-accidental trauma or child

abuse. On cross-examination, Dr. Lowen testified that she could not say the victim's injuries were greater due to the failure to seek immediate medical attention.

Susan Pruitt, a licensed senior psychological examiner, testified that she evaluated the Appellant in September 2011 and administered various tests. She said that the Appellant was of average intellect and communication skills and that he "'reluctantly shared details from two incidents in which he takes responsibility for injuries to [the victim].'" The Appellant claimed that the victim was crying, that he threw her into the air three times in order to distract her from crying, that he failed to catch her the third time, and that she hit a piece of exercise equipment. The Appellant also claimed that three days before he failed to catch the victim, he dropped her onto her crib. Pruitt said the Appellant "'seemed very remorseful'" and was "'teary eyed.'"

At the conclusion of Pruitt's testimony, the State rested its case and made the following election of offenses: count one, aggravated child abuse, was based on the Appellant's causing multiple rib fractures to the victim sometime in June 2011; count two, aggravated child abuse, was based on the Appellant's causing skull fractures, a "brain bleed," and a brain injury to the victim on or about July 1, 2011; count three, aggravated child abuse, was based on the Appellant's causing a buckle fracture of the victim's femur on or about July 1, 2011; and count four, aggravated child neglect, was based on the Appellant's causing multiple fractures, a brain bleed, and a brain injury to the victim on diverse dates between June and July 3, 2011, and failing to seek prompt medical attention for her injuries.

Matthew Norman, a licensed psychiatrist, testified that he examined the Appellant at defense counsel's request. Based on the Appellant's test results, Dr. Norman concluded that the Appellant was "more compliant than ninety-five percent of individuals in the general population." The Appellant was in the seventy-fifth percentile for suggestibility and "ninety-five percent more likely than someone in the general population to shift his answers." Dr. Norman acknowledged that the Appellant was "more likely to bend to the will" of authority than the average person and that he was more likely to change his answer to one suggested or desired by the questioner. Dr. Norman described the Appellant as "someone to avoid conflict and wants to conform." He could not say that the Appellant was truthful with Detective Stephens, but he acknowledged that the Appellant may have been truthful with the officer. He also acknowledged that he had watched or listened to some of the Appellant's interviews with Detective Stephens, including the video-recorded interview on July 7, and that some of the officer's questions were suggestive or leading. On cross-examination, Dr. Norman acknowledged that during the Appellant's interviews with the detective, the Appellant often interrupted him and tried to deflect his questions to a different topic.

At the conclusion of Dr. Norman's testimony, the jury acquitted the Appellant of count one, aggravated child abuse based on the victim's rib fractures. However, the jury found him guilty as charged of count two, aggravated child abuse based on the victim's skull and brain injuries, and count three, aggravated child abuse based on the victim's femur fracture, Class A felonies. In count four, the jury found the Appellant guilty of knowing aggravated assault, a Class C felony, as a lesser-included offense of aggravated child neglect resulting in serious bodily injury. After a sentencing hearing, the trial court merged the aggravated assault conviction into the aggravated child abuse convictions and sentenced the Appellant to concurrent sentences of twenty-five years to be served at 100%.

## II. Analysis

### A. Motion to Sever

The Appellant contends that the trial court erred by failing to grant his motion to sever count one from the remaining counts. The State argues that the trial court properly denied the motion because the offenses were part of a common scheme or plan. We conclude that the Appellant has waived this issue.

Before trial, the Appellant filed a motion for a bill of particulars, and the State responded that count one related to the Appellant's causing multiple rib fractures to the victim "some time in the month preceding 7-4-11"; that count two related to the Appellant's causing multiple skull fractures to the victim on July 1 or 2, 2011; that count three related to the Appellant's causing a buckle fracture to the victim's femur on July 1 or 2, 2011; and that count four related to the Appellant's "ongoing neglect of the victim" and failure to seek medical treatment for her injuries. Subsequently, the Appellant filed a motion to sever count one from the remaining counts on the basis that State could not identify a date for the rib fractures or how they occurred.

Although the record reflects that the trial court held a severance hearing and denied the Appellant's motion, the hearing transcript is not in the appellate record. It is the Appellant's duty to prepare a record which conveys a fair, accurate, and complete record on appeal to enable meaningful appellate review. See Tenn. R. App. P. 24(b). Moreover, the State's brief notes the transcript's absence from the record, and we are perplexed that the Appellant chose to let the record remain incomplete rather than request permission to supplement the record with the transcript pursuant to Rule 24(g), Tennessee Rules of Appellate Procedure.

The trial court filed a written order explaining its denial of the motion, but the court did not state in the order its specific basis for its finding that counts one through

three were part of a common scheme or plan. "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Therefore, we conclude that the Appellant is not entitled to relief.

## B. Prior Bad Acts

The Appellant claims that the trial court erred by allowing the jury to hear that he told the police he had been "in trouble" with the law previously and had a prior conviction for breaking and entering. The State argues that the trial court properly found the evidence admissible. We conclude that the Appellant is not entitled to relief.

The Appellant's trial began on Monday, February 24, 2014. Prior to voir dire, the State advised the trial court that "[o]ver the weekend," defense counsel had requested that the State redact portions of the Appellant's interviews with law enforcement in which the Appellant had made statements about his prior criminal history. The trial court noted that defense counsel had "waited until the last minute" but agreed to address the issue later in the trial.

Before Detective Stephens testified, the parties argued the redaction issue to the trial court. Relevant to this appeal, the State argued that the jury should be allowed to hear that during the Appellant's first interview with the detective, the Appellant voluntarily stated that he had been in trouble with the law but that he had been a good person for the past four or five years. The Appellant continued to say during his interviews that he had been in trouble previously. The State argued that his statements were admissible because they were "part of his denial mechanism," "material to [his] efforts to avoid making statements that are damaging to himself," and relevant to counter Dr. Norman's expected testimony that the Appellant was highly compliant and suggestible. The State also argued that the jury should be allowed to hear that Detective Stephens asked the Appellant during his first interview if he had ever been arrested and that the Appellant said he had been arrested for breaking into and entering his girlfriend's house in 2001, that he left roses and lunch for her, and that he "did probation and counseling and stuff." The trial court asked how the statements about the breaking and entering were relevant, and the State acknowledged that the statements were not particularly relevant "other than . . . [he] has had a number of contacts with the law . . . , which would be pertinent to potential questions posed to Dr. Norman."

The trial court stated that defense counsel's late request for the redaction had "technically . . . violated the [local] rules" so that the issue had been waived but that "I'll address it anyway." The then court ruled as follows:

I think the comment . . . I've been in trouble with the law before, but I have been nothing but a good person for the past four or five years. There's really nothing specific in that. I'm not going to redact that. What I will give -- as I've said, I'll give a limiting instruction that they can't consider any, quote, trouble in the past or prior bad acts for his propensity to commit this crime. It's a context kind of thing.

. . . .

So the business about he got arrested for breaking and entering -- the context I've been in trouble before, I'll let it in. But these specific things, he broke into the girlfriend's house, left roses, got probation and counseling, . . . I don't think they need to hear . . . . I don't think those specifics need to come in. So that needs to be redacted as best you can.

. . . .

I'm deleting those things that specifically describe certain crimes. But in terms of the relevance of the context of this is that he says, I've been in trouble -- I'm a good person, I would never do this . . . . His whole point of the interview is that I would never do this, I am not that kind of person, I have learned my lesson. And that's the context for which it is brought in. It's not overly prejudicial. I'm going to give a limiting instruction. . . . It's that context that he's bringing it up, that is, I have learned my lesson, I was -- I had some issues in the past. The jurors are not going to know exactly what those are. I've changed, I would never do this, I was beaten as a child, I would therefore never do that to my child. So I think it's relevant in terms of a general context of that. Again, I'm going to give the limiting instruction. So that's my ruling on that.

The State noted that the Appellant's first recorded interview was almost two and one-half hours long and, therefore, that the State was going to have Detective Stephens summarize the interview rather than the State play it for the jury. However, the State agreed to redact the interview and introduce it as an exhibit "[i]f the jury wants to listen to it."

Essentially, the Appellant is alleging that the trial court improperly allowed the

jury to hear of prior bad acts that were irrelevant to the offenses at issue. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.

First, the Appellant claims that the trial court erred by ruling that he waived the issue for violating the local rules. Although the trial court stated that the issue had been waived, it then proceeded to rule on the admissibility of the evidence. Thus, we will address that ruling.

The Appellant contends that the trial court erred by allowing the jury to hear that he had been in trouble with the law and had a prior arrest or conviction for breaking and entering. However, the trial court clearly ruled that the jury could not hear about any specific crimes and that the State had to redact his statements about the breaking and entering from the interviews. Our review of the first interview with Detective Stephens, which was not played for the jury but was introduced into evidence as exhibit 2A, confirms that the State removed the statement about being convicted of breaking and entering from the recording. During the Appellant's second interview, which was played for the jury and was introduced into evidence as exhibit 3, the Appellant did not say he had been arrested or convicted of breaking and entering but told Detective Stephens that he had been in trouble previously for entering his girlfriend's apartment through a window and leaving a dozen roses and lunch for her. However, defense counsel did not object or request a mistrial for the State's playing the statement. Therefore, to the extent

that the Appellant is arguing that the jury improperly heard about the breaking and entering during his second interview, that issue has been waived. <u>See</u> Tenn. R. App. P. 36(a).

As to the Appellant's repeatedly volunteering during his interviews that he had been "in trouble" previously, the trial court did not explain, and we fail to see, how the statement gave context to his claim that he would never harm his children. In any event, the jury did not hear that the Appellant had been arrested, charged, or convicted of any crime. Moreover, the only "trouble" revealed to the jury was the Appellant's statement during his second interview that he broke into his girlfriend's apartment to leave her flowers and lunch, which was not particularly prejudicial to the offenses at issue. Finally, the trial court instructed the jury during the testimony and during the final charge that it could not consider the Appellant's criminal history as evidence of his propensity to commit the crimes for which he was on trial. Generally, we presume that a jury has followed the trial court's instructions. <u>See</u> <u>State v. Butler</u>, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Thus, we conclude that the Appellant is not entitled to relief.

## C. "Knowingly" Instruction

The Appellant contends that the trial court erred by giving the jury a supplemental instruction on "knowingly" that failed to include language regarding non-accidental conduct. The State argues that the trial court properly instructed the jury. We agree with the State.

During the jury charge, the trial court instructed the jurors on aggravated child abuse, in pertinent part, as follows:

> For you to find a defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that a defendant, or a person for whom the defendant is criminally responsible, knowingly, <u>other than by accidental means</u>, treated a child under eight (8) years of age in such as manner as to inflict injury; and
>
> (2) the act of abuse resulted in serious bodily injury to the child.
>
> . . . .

A person acts "knowingly" if that person acts with an awareness:

(1) that his or her conduct is of a particular nature; or

(2) that a particular circumstance exists.

The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally. A person acts "intentionally" when the person acts with a conscious objective or desire to engage in particular conduct.

(Emphasis added.)

During deliberations, the jury requested that the trial court "give a better definition or explain knowingly[,] particularly [the portion of the definition that 'a particular circumstance exits'][.]" The record reflects that defense counsel requested that the trial court's response include language regarding "non-accidental conduct." However, the trial court gave the following supplemental written instruction:

You are not to place undue emphasis on this supplemental instruction. This instruction should be carefully considered along with all previous instructions in light of and in harmony with the other.

. . . .

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist.

The requirement of knowingly is also established if it is shown that the defendant acted intentionally.

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct when it is the person's conscious objective or desire to engage in the conduct.

- 12 -

"Conduct" involves the nature of the proscribed act or the manner in which the defendant acts, for example, the physical act, commission or omission, but not limited to.

"Circumstances surrounding the conduct" refers to a situation which relates to the defendant's culpability, for example, age of the victim, condition of the victim, but not limited to.

A person acts "knowingly" if that person acts with an awareness:

1) that his or her conduct is of a particular nature[.]

The Appellant contends that the trial court erred by failing to include non-accidental conduct in the supplemental instruction. He contends that he was prejudiced by the error because the jury "was obviously struggling with the definition of knowingly."

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). "A trial court has the authority to respond to jury questions with a supplemental instruction." Id. at 451. This court "must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." State v. Clark, 452 S.W.3d 268, 295 (Tenn. 2014).

In this case, the Appellant does not contend that the supplemental instruction was incorrect. Instead, he claims that the instruction was incomplete in that it failed to include language regarding non-accidental conduct. However, the original instruction provided that the Appellant had to act "knowingly, other than by accidental means." Moreover, the supplemental instruction stated that the jury was to consider it "in light of and in harmony with the other." As stated previously, we generally presume that a jury has followed the trial court's instructions. See Butler, 880 S.W.2d at 399. The supplemental instruction did not mislead the jury as to the applicable law, nor did it fail to fairly submit the legal issue. Thus, we conclude that the trial court did not err.

D. Cumulative Error

- 13 -

Finally, the Appellant contends that he is entitled to relief based upon cumulative error. While we have found that the trial court erred, we have concluded that the error was harmless. Thus, we find no merit to this claim. Nevertheless, we conclude that the Appellant's conviction of knowing aggravated assault must be modified to misdemeanor reckless endangerment because knowing aggravated assault is not a lesser-included offense of aggravated child neglect as charged in this case.[1]

In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), our supreme court set out a three-part test for determining whether an offense was a lesser-included offense of the charged offense. Part (a) provided that an offense was a lesser-included offense if all of its statutory elements were included within the statutory elements of the offense charged. Burns, 6 S.W.3d at 466. Part (b) provided that an offense was a lesser-included offense if it failed to meet the definition in part (a) only because it contained a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability and/or (2) a less serious harm or risk of harm to the same person, property, or public interest. Id. at 466-67. Finally, part (c) provided that an offense was a lesser-included offense if it consisted of facilitation, attempt, or solicitation of the offense charged. Id. at 467. The trial court was to instruct the jury on all lesser-included offenses if the evidence was legally sufficient to support a conviction for the lesser-included offense. Id. at 469.

In 2009, Tennessee Code Annotated section 40-18-110 was amended to provide that an offense is a lesser-included offense if:

> (1) All of its statutory elements are included within the statutory elements of the offense charged;
>
> (2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);
>
> (3) The offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or

---

[1] Although the Appellant did not object to the aggravated assault instruction at trial, such failure to object "in this situation" does not waive the issue. State v. John J. Ortega, Jr., No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *7 (Tenn. Crim. App. at Nashville, Apr. 23, 2015) (holding that defendant's failure to object to jury instruction on offense that is not lesser-included offense does not constitute an implicit consent to an amendment of the indictment, and, therefore, does not waive the issue on appeal). However, the Appellant failed to raise the issue in his motion for new trial. See Tenn. R. App. P. 3(e). Therefore, we review the issue for plain error. See Tenn. R. App. P. 36(b).

> (4) The offense is solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

Tenn. Code Ann. § 40-18-110(f). "Subsection (f) effectively codified parts (a) and (c) of the Burns test." Howard, 504 S.W.3d at 269. Furthermore, subsection (g) was added to specify certain lesser-included offenses. See Tenn. Code Ann. § 40-18-110(g) (providing that second degree murder is a lesser-included offense of first degree murder, voluntary manslaughter is a lesser-included offense of first degree premeditated murder and second degree murder, aggravated sexual battery is a lesser-included offense of aggravated rape, and sexual battery and sexual battery by an authority figure are lesser-included offenses of rape and aggravated rape). Recently in Howard, our supreme court determined that subsections (f) and (g) did not abrogate part (b) of the Burns test and that part (b) continues to be applicable to determining whether an offense is a lesser-included offense. Id. at 270.

As charged in the indictment, aggravated child neglect occurs when a person commits child neglect, and the neglect results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1). Child neglect occurs when "[a]ny person . . . knowingly abuses or neglects a child . . . so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(b).[2] The jury convicted the Appellant of knowing aggravated assault resulting in serious bodily injury as a lesser-included offense of aggravated child neglect resulting in serious bodily injury. Relevant to this case, aggravated assault occurs when a person knowingly commits an assault and the assault results in serious bodily injury to another. Tenn. Code Ann. § 39-13-102(a)(1)(A)(i). A person commits an assault when he or she knowingly causes bodily injury to another. Tenn. Code Ann. § 39-13-101(a)(1).

The statutory element of assault, i.e., causing bodily injury to another, is not included in the statutory elements of aggravated child neglect resulting in serious bodily injury. Moreover, aggravated assault is not specified as a lesser-included offense of aggravated child neglect. Thus, aggravated assault resulting in serious bodily injury is not a lesser-included offense of aggravated child neglect resulting in serious bodily injury under subsections (f) or (g) of Tennessee Code Annotated section 40-18-110.

Pursuant to Howard, we must also consider whether knowing aggravated assault resulting in serious bodily injury is a lesser-included offense of aggravated child neglect resulting in serious bodily injury under part (b) of Burns. First, knowing aggravated

---

[2] Child neglect committed on a child less than eighteen years old is a Class A misdemeanor, whereas child neglect committed on a child eight years of age or less is a Class E felony. Tenn. Code Ann. § 39-15-401(b)(1).

assault does not contain a different mental state indicating a lesser kind of culpability than aggravated child neglect, which also requires that a defendant act knowingly. Second, conduct that causes bodily injury and results in serious bodily injury does not create a less serious harm or risk of harm to a child than conduct that adversely affects the child's health and welfare and results in serious bodily injury. Accordingly, we hold that knowing aggravated assault resulting in serious bodily injury is not a lesser-included offense of aggravated child neglect resulting in serious bodily injury. The trial court's instructing the jury on knowing aggravated assault was plain error.

When a jury convicts a defendant of a lesser-included offense, and this court later concludes that the convicted offense was not a lesser-included offense of the charged offense, this court can modify the convicted offense to the next properly-charged lesser-included offense that was supported by the evidence. See State v. John J. Ortega, Jr., No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *11 (Tenn. Crim. App. at Nashville, Apr. 23, 2015) (citing State v. Swift, 308 S.W.3d. 827, 831-32 (Tenn. 2010)). In this case, the trial court instructed the jury to consider the charged offense and its lesser-included offenses in the following order: aggravated child neglect, knowing aggravated assault, child neglect, reckless aggravated assault, reckless endangerment, and knowing or reckless assault.[3] Child neglect is a lesser-included offense of aggravated child neglect under Tennessee Code Annotated section 40-18-110(f)(1).

The victim's mother testified that the Appellant suggested taking the victim to the hospital several times but that she refused because she thought the victim was reacting to the immunizations, and Dr. Lowen testified that she could not say the victim's injuries were greater due to the failure to seek immediate medical attention. As stated above, a conviction of aggravated child neglect requires the jury's finding that the defendant knowingly abused or neglected a child so as to adversely affect the child's health and welfare and that the neglect resulted in serious bodily injury whereas child neglect requires finding only that that defendant knowingly abused or neglected a child so as to adversely affect the child's health and welfare. Here, the jury obviously found serious bodily injury, convicting the Appellant of aggravated child abuse resulting in serious bodily injury. Therefore, we must surmise that the jury failed to convict the Appellant of aggravated child neglect based upon the jury's failure to find that the neglect adversely affected the victim's health and welfare. Accordingly, under these circumstances, we

---

[3] The trial court actually charged fifteen offenses as lesser-included offenses of aggravated child neglect and ordered that the jury consider the offenses in the following order: aggravated child neglect, facilitation of aggravated child neglect, attempted aggravated child neglect, facilitation of attempted aggravated child neglect, knowing aggravated assault, facilitation of knowing aggravated assault, attempted knowing aggravated assault, facilitation of attempted knowing aggravated assault, child neglect, facilitation of child neglect, attempted child neglect, facilitation of attempted child neglect, reckless aggravated assault, reckless endangerment, knowing or reckless assault, and attempted knowing assault.

must conclude that the proof does not support a conviction of child neglect. The next properly-charged lesser-included offense that was supported by the evidence was misdemeanor reckless endangerment which occurs when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a); see State v. Adler, 92 S.W.3d 397, 403 (Tenn. 2002) (noting that reckless endangerment is a lesser-included offense of aggravated child neglect). Thus, the Appellant's conviction of knowing aggravated assault in count four is modified to reckless endangerment.

### III. Conclusion

Based upon the record and the parties' briefs, we conclude that the trial court erred by allowing the jury to hear that the Appellant had been "in trouble" previously but that the error was harmless. However, we must modify the Appellant's conviction of knowing aggravated assault in count four to misdemeanor reckless endangerment because knowing aggravated assault is not a lesser-included offense of aggravated child neglect. The Appellant's remaining convictions in counts two and three are affirmed. The conviction of reckless endangerment merges into the convictions for aggravated child abuse. Thus, his effective twenty-five-year sentence is also affirmed.

_____
NORMA MCGEE OGLE, JUDGE